# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

COUNTY 10 PM 3:05

WAL-MART STORES, INC.,

     Plaintiff,

vs.                                      No. CIV 00 608LCS

DAN SANCHEZ d/b/a FORTRESS
SECURITY AND INVESTIGATIONS,
FORTRESS SECURITY AND INVESTIGATIONS, INC.,
MARTY D. VALERIO, LLOYDS OF LONDON,
GENESIS INDEMNITY, CENTURY SURETY COMPANY,
and LEAVELL INSURANCE, INC.,

     Defendants.

## FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, QUANTUM MERUIT, UNJUST ENRICHMENT, CONVERSION AND BREACH OF BAILMENT, NEGLIGENCE, RESPONDEAT SUPERIOR, NEGLIGENT HIRING, TRAINING AND RETENTION, BREACH OF FIDUCIARY DUTY AND BAD FAITH, TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS, FAILURE TO PAY LOSS, BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING, VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, AND VIOLATION OF THE NEW MEXICO INSURANCE CODE

COMES NOW Plaintiff Wal-Mart Stores, Inc., through its counsel of record

Dixon, Scholl & Bailey, P.A., and makes its complaint for damages resulting from

the loss or theft of a bag for deposit containing money and legal tender totaling

WAL-MART STORES, INC. V. SANCHEZ ET AL.
COMPLAINT PAGE 1

$90,853.88.  The only amendment made in this First Amended Complaint is the attachment of the Contract referenced herein as Exhibit A.

## Jurisdiction and Venue

1.    Wal-Mart Stores, Inc. (hereinafter "Wal-Mart") is incorporated in Delaware with its principal place of business in Arkansas, and doing business in the State of New Mexico.

2.    Daniel Sanchez d/b/a/ Fortress Security and Investigations (hereinafter "Sanchez") is licensed to do business as an armored car company in the State of New Mexico with his principal place of business in Hobbs, New Mexico.

3.    Fortress Security and Investigations, Inc. (hereinafter "Fortress") is incorporated in the state of Colorado with a principal place of business in Hobbs, New Mexico.

4.    Marty Valerio was a resident of the State of New Mexico on May 3, 1999, and upon information and belief, he is still resident of New Mexico.

5.    Lloyd's of London is an insurance underwriter and acts as the authorized attorney-in-fact for underwriters for insurance against loss from armored cars, doing business under the name and style of the Lloyd's of London, domiciled or incorporated in Illinois.

6.   Lloyd's of London has authorized the Insurance Commissioner of the State of New Mexico to accept process on its behalf.

7.   *Genesis Indemnity is a North Dakota corporation authorized by the Insurance Commission to do business in the State of New Mexico to engage in the business of writing and selling insurance in this state.*

8.   Genesis Indemnity has authorized the Insurance Commissioner of the State of New Mexico to accept process on its behalf.

9.   Century Surety Company is an Ohio corporation doing business in the State of New Mexico by engaging in the business of writing and selling insurance in this state.

10.  Leavell Insurance, Inc. is a New Mexico corporation which acts as an insurance agent or broker with its principal place of business in Hobbs, New Mexico.

11.  The damages complained of arise from the loss or theft of a deposit bag containing $90,853.88 on May 3, 1999.

12.  The deposit bag was lost by, stolen from or stolen by Marty Valerio, an employee of Daniel Sanchez and/or Fortress Security and Investigations, Inc.

13.  The contents of the deposit bag belonged to Wal-Mart.

14.   The deposit bag had been entrusted to Defendants Sanchez, Fortress, and Valerio.

15.   The loss or theft of the deposit bag occurred in San Miguel County, New Mexico.

16.   Pursuant to a contract for armored car and security services between Wal-Mart and Sanchez, this claim is being made in the Federal Court venue in which San Miguel County lies.

17.   The parties are of different states and the amount in controversy exceeds $75,000.00.

18.   Diversity jurisdiction with this Court exists pursuant to 28 U.S.C. §1332.

19.   This Court has subject matter jurisdiction.

20.   This Court has personal jurisdiction

21.   The venue is proper.

## Background facts

22.   Plaintiff realleges and incorporates by reference the foregoing allegations.

23.   On June 3, 1997, Wal-Mart and Daniel Sanchez d/b/a Fortress Security and Investigations entered into a contract titled the "Armored Car Service Agreement" (hereinafter the Agreement), attached hereto as Exhibit A.

24.   The Agreement provided, among other things, for Sanchez to receive bags of money and legal tender for deposit from the Wal-Mart Store in Las Vegas, New Mexico and deliver said bags to the Bank of Las Vegas.

25.   The Agreement further provided that Sanchez shall provide cargo insurance including employee theft coverage insuring the full value of all property receipted for by Sanchez.

26.   The Agreement provided that Wal-Mart shall be named as a loss payee on the cargo insurance.

27.   The Agreement also provided that Wal-Mart shall be named as an additional insured for liability insurance coverages with a minimum liability coverage of $2,000,000.00 per occurrence.

28.   The Agreement specifically states that Sanchez shall provide Wal-Mart with a copy of all or any portion of all policies of insurance, upon request.

29.   The Agreement provided that Sanchez shall pay Wal-Mart for losses within 30 days after notice of said loss, and any amounts not paid within such time, for which Sanchez shall be obligated, shall bear interest at the "Prime Rate" as established from time to time by Wachovia Bank & Trust, Winston-Salem, North Carolina, thereafter until paid.

30. The Agreement provided that Sanchez shall reimburse Wal-Mart for any costs incurred in reconstructing any checks or non-cash items constituting part of a loss, plus any costs incurred to stop payment of any such checks.

31. On May 3, 1999, Marty Valerio was employed by Sanchez or Fortress.

32. May 3,1999 was the first day that Marty Valerio was allowed to transport property in the armored vehicle alone or by himself.

33. On May 3, 1999 Marty Valerio received four bags for deposit from the Wal-Mart Store in Las Vegas, New Mexico.

34. Those four bags for deposit contained cash money and legal tender belonging to Wal-Mart.

35. Later on May 3, 1999, Marty Valerio delivered only three bags for deposit to the Bank of Las Vegas.

36. The bag which was not delivered contained $90,853.88 in cash and non-cash items.

### Count I for Breach of Contract against Daniel Sanchez d/b/a Fortress Security and Investigations and/or Fortress Security and Investigations, Inc.

37. Plaintiff realleges and incorporates by reference the foregoing allegations.

38. Plaintiff performed all obligation under the contract.

39.   Daniel Sanchez and/or Fortress Security and Investigations, Inc. (hereinafter Sanchez/Fortress)breached its contract by failing to deliver the deposit bags it received from Wal-Mart to the Bank of Las Vegas.

40.   Sanchez/Fortress breached its contract by failing to pay Wal-Mart for the loss of the contents of the deposit bag.

41.   Sanchez/Fortress breached its contract by failing to reimburse Wal-Mart for expenses incurred in reconstructing non-cash items and amounts owed in interest due to failure to pay loss in a timely manner.

42.   As a direct result of the breach, Plaintiff suffered the loss of a deposit bag containing the amount of $90,853.88, plus interest, and non-cash item reconstruction costs.

43.   Plaintiff has demanded payment of the amounts due and owing from Defendants.

44.   Defendants have failed and refused to pay Plaintiff the amounts owed.

45.   Defendants' breaches and failure to pay have been done with malice, recklessness, oppressiveness, and fraudulently.

46.   Pursuant to the contract, Plaintiff is entitled to recover its losses, costs, and interest.

47.    Plaintiff also seeks punitive damages against Defendants.

## Count II for Quantum Meruit against Daniel Sanchez d/b/a/ Fortress Security and Investigations and/or Fortress Security and Investigations, Inc. and Marty Valerio

48.    Plaintiff realleges and incorporates by reference the foregoing allegations.

49.    On May 3, 1999, Sanchez/ Fortress and Valerio took money from Wal-Mart and promised to deliver it to the Bank of Las Vegas and to insure Wal-Mart fully for any losses incurred by Wal-Mart as a result of Sanchez, Fortress and Valerio's transportation of the goods.

50.    The reasonable value of the contents of the deposit bag not delivered to the Bank of Las Vegas by Sanchez, Fortress and Valerio is $90,853.88.

51.    Sanchez, Fortress and Valerio had notice that they were transporting money and legal tender for Wal-Mart.

52.    Wal-Mart has demanded from Sanchez/Fortress the sum of $90,853.88, but they have refused, and continue to refuse, to pay Wal-Mart for any part of it.

## Count III for Unjust Enrichment against Daniel Sanchez d/b/a Fortress Security and Investigations and/or Fortress Security and Investigations, Inc. and Marty Valerio

53.    Plaintiff realleges and incorporates by reference the foregoing allegations.

54.   Sanchez/Fortress entered into a contract to transport money and property of value from the Wal-Mart Store in Las Vegas, New Mexico to the Bank of Las Vegas.

55.   Sanchez/Fortress was compensated for these armored car services.

56.   Sanchez/Fortress and Valerio took receipt of a bag containing $90,853.88 on May 3, 1999.

57.   Sanchez/Fortress and Valerio never returned that bag containing $90,853.88 to Wal-Mart.

58.   Sanchez/Fortress and Valerio have never compensated Wal-Mart for this amount.

59.   Sanchez/Fortress and Valerio have been unjustly enriched by $90,853.88.

60.   To allow Sanchez/Fortress and Valerio to keep said $90,853.88 would be unjust and inequitable.

61.   Plaintiff is entitled under equity to have the full sum disgorged by Defendants and returned.

### Count IV for Conversion and Breach of Bailment against Daniel Sanchez d/b/a/ Fortress Security and Investigations, Fortress Security and Investigations, Inc., and Marty Valerio

62.   Plaintiff realleges and incorporates by reference the foregoing allegations.

63.   Sanchez/Fortress contracted to provide armored car services to Wal-Mart.

64.   Sanchez/Fortress attempted to perform their contractual obligations through their agent Valerio.

65.   On May 3, 1999, Valerio accepted four bags for deposit from Wal-Mart.

66.   While the bags were in Valerio's custody and possession, Valerio exercised control over the bags.

67.   On May 3, 1999, Sanchez, Fortress and Valerio delivered only three bags for deposit to Bank of Las Vegas.

68.   Sanchez/Fortress were contractually obligated to act as insurers of the property of Wal-Mart in its possession and control.

69.   A bailment relationship existed between Wal-Mart and Sanchez/ Fortress.

70.   On May 12, 1999, Wal-Mart demanded that Sanchez / Fortress return of the funds contained in the bag not delivered to Bank of Las Vegas.

71.   Sanchez, Fortress and Valerio refused and still refuse to return to Wal-Mart the sum of the contents of the lost deposit bag.

### Count V for Negligence against Daniel Sanchez d/b/a Fortress Security, Investigations and/or Fortress Security and Investigations, Inc. and Marty Valerio

72.   Plaintiff realleges and incorporates by reference the foregoing allegations.

73.   Sanchez, Fortress and Valerio had a duty to ensure that deposit bags they picked up at Wal-Mart were delivered to the Banks of Las Vegas without loss or theft.

74.   Sanchez, Fortress and Valerio failed to exercise ordinary care in providing armored car and security services when they allowed one of Wal-Mart's deposit bags to be lost or stolen.

75.   As a proximate result of the negligent acts and/or omissions of Sanchez/Fortress, and Valerio, Wal-Mart suffered the loss of a deposit bag containing $90,853.88.

76.   As a further proximate result of the negligent acts and/or omissions of Sanchez/Fortress and Valerio, Wal-Mart has incurred costs in recreating check histories, and lost revenues from the interest which it would have earned on the money since May 3, 1999.

## Count VI for Respondeat Superior against Daniel Sanchez d/b/a Fortress Security and Investigations and/or Fortress Security and Investigations, Inc.

77.   Plaintiff realleges and incorporates by reference the foregoing allegations.

78.   Marty Valerio was at all times pertinent hereto an employee of Sanchez/Fortress.

79.   At all times pertinent hereto, Valerio was clothed with the actual authority to act on behalf of Sanchez/Fortress.

80.   Valerio did act with actual authority to act on behalf of Sanchez/Fortress.

81.   Wal-Mart relied upon the Valerio's authority to act as an agent or employee for Sanchez/Fortress.

82.   On May 3, 1999, Marty Valerio was acting in the course and scope of his employment when he accepted receipt of four bags for deposit from Wal-Mart.

83.   On May 3, 1999, Marty Valerio delivered only three bags for deposit to the Bank of Las Vegas.

84.   Valerio acted negligently in the transport of the bags, allowing one to be lost or stolen.

85.   Through the act or omissions of Valerio, the Agreement between Wal-Mart and Sanchez/Fortress was breached.

86.   Under the theory of respondeat superior, Sanchez/Fortress are liable for the acts and omissions of Marty Valerio which resulted in damage to Wal-Mart.

**Count VII for Negligent Hiring, Training and Retention against**
**Daniel Sanchez d/b/a Fortress Security and**
**Investigations and/or Fortress Security and Investigations, Inc.**

87.   Plaintiff realleges and incorporates by reference the foregoing allegations.

88.   Sanchez/Fortress had a duty to exercise ordinary care in hiring, supervising, training and retaining armored car drivers who transport cash money and legal tender for customers.

89.   Marty Valerio was at all times pertinent hereto an employee of Sanchez and/or Fortress.

90.   Valerio was hired to transport large amounts of money belonging to Sanchez/Fortress' customers.

91.   Valerio's training began on April 23, 1999 and ended on May 2, 1999.

92.   After only ten days of training, Sanchez/Fortress allowed Valerio to pick up and transport customer money unsupervised and alone.

93.   May 3, 1999, the day when Valerio made the pick up in question from Wal-Mart, was the first day that he received deposits alone and unsupervised.

94.   Prior to working for Sanchez/Fortress, Valerio had been employed as a corrections officer for less than three months.

95.   Sanchez/Fortress failed to perform an adequate background check, instead relying on the representations of Valerio and others.

96.   Sanchez/Fortress failed to exercise ordinary care in hiring and retaining Valerio to work as an armored car driver.

97.   Sanchez/Fortress failed to exercise ordinary care in training Valerio in the transportation of money in armored cars.

98.   Sanchez/Fortress failed to exercise ordinary care in supervising Valerio while he was transporting money for customers of Sanchez/Fortress.

99.   As a proximate result of Sanchez/Fortress' negligent, hiring, training, supervision, and retention, Wal-Mart suffered the loss of a deposit bag containing $90,853.88, reconstruction costs, and interest.

## Count VIII for Breach of Fiduciary Duty and Bad Faith against Leavell Insurance, Inc.

100.  Plaintiff realleges and incorporates by reference the foregoing allegations.

101.  Sanchez/Fortress bought general liability, excess and cargo insurance policies which were in effect on May 3, 1999.

102.  Sanchez/Fortress bought these insurance policies through or from Leavell Insurance, Inc., an insurance broker or agent.

103.  Pursuant to the Agreement, Sanchez/Fortress named Wal-Mart as an additional insured on the insurance policies issued by Lloyds of London,

Century Surety Company, and Genesis Indemnity, which were procured from Leavell.

104. Further pursuant to the Agreement, Sanchez/Fortress named Wal-Mart as a loss payee on the insurance policies issued by Lloyds of London, which were procured from Leavell.

105. Leavell provided Wal-Mart with Certificates of Liability Insurance indicating that Wal-Mart was an additional insured on all policies indicated above and a loss payee on the Lloyds policies

106. By virtue of the following, Leavell owes Wal-Mart a fiduciary duty.

107. Leavell also has a duty to deal fairly and in good faith with Wal-Mart in the performance of the various insurance contracts which it sold.

108. Leavell Insurance, Inc. acted in bad faith when it refused to provide Wal-Mart with copies of the policies to which Wal-Mart was an additional insured or loss payee.

109. Leavell breached its fiduciary and agency duty to Wal-Mart by refusing to provide Wal-Mart with copies of the policies from Lloyds, Century and Genesis upon request.

110. Leavell wantonly and maliciously breached its duty as an agent and a fiduciary to Wal-Mart by rejecting Wal-Mart's request for the policies, claiming allegiance to Sanchez over Wal-Mart.

111. Leavell refused to give Wal-Mart copies of the policies unless Wal-Mart sued it or the insurance companies.

112. Leavell forced Wal-Mart to sue to enforce Leavell's fiduciary duties.

113. As a direct and proximate result of Leavell's breach, Wal-Mart does not have access to the terms of the policies and requirements for making claims of loss.

114. As a direct and proximate result of Leavell's breach, Wal-Mart does not know if its actions conform to the terms of the policies.

115. Any defense of untimeliness or improper notice of claim made by any of the aforementioned insurance carriers is a direct result of Leavell's breach of its fiduciary duty.

116. As a direct and proximate result of Leavell's acts and omissions, Wal-Mart has been damaged by the loss of a deposit bag containing $90,853.88, reconstruction costs, attorney's fees, litigations costs, and interest.

117.   Wal-Mart seeks punitive damages for the wanton and malicious breaches of contractual obligations and fiduciary duty.

## Count IX for Tortious Interference with Contractual Relations against Leavell Insurance, Inc.

118.   Plaintiff realleges and incorporates by reference the foregoing allegations.

119.   Wal-Mart, as additional insured to the insurance policies with Lloyds, Century and Genesis, has a contractual relationship with those three insurance companies.

120.   While Wal-Mart has been in a contractual relationship with those three companies, Leavell has interfered in those relationships.

121.   Leavell has interfered in those relationships by:

a.      refusing to give Wal-Mart copies of the policies;

b.      accepting notice of claim from Wal-Mart but not allowing Wal-Mart direct communication with those insurance companies;

c.      preventing Wal-Mart from knowing the terms of those policies, specifically the procedures for making claims; and

d.      preventing Wal-Mart from making claims according to the terms of the policies.

122. Leavell maliciously and wantonly interfered in Wal-Mart's contractual relationship with Lloyd, Century and Genesis with the intention of preventing Wal-Mart from making a claim.

123. Leavell wantonly and maliciously interfered with Wal-Mart's contractual relationships.

124. The purpose of Leavell's interference was to benefit Daniel Sanchez/Fortress, and prevent a claim from being paid against them to Wal-Mart.

125. Leavell acted with the intentions of injuring Wal-Mart.

126. As a proximate result of Leavell's contractual interference, Wal-Mart has been damaged by the loss of a deposit bag containing $90,853.88, reconstruction costs, interest, and attorney's fees and litigation costs.

127. As a further damage, Wal-Mart seeks an award of punitive damages for the willful, wanton, intentional, and malicious manner in which Leavell interfered with the insurance policies.

### Count X for Failure to Pay Loss against Lloyds of London

128. Plaintiff realleges and incorporates by reference the foregoing allegations.

129. On December 13, 1998 Daniel Sanchez d/b/a Fortress Security and Investigations obtained two armored car insurance policies for cargo

insurance, policies numbered 7006 of Lloyds London and MDJ 9811004 of Lloyds London.

130. Those two policies did not expire until December 13, 1999.

131. Wal-Mart Stores, Inc., its subsidiaries and its affiliates are named as additional insureds and loss payees on the policies.

132. On May 3, 1999 while the policies were in full force and effect, and while Wal-Mart was the sole and unconditional owner of the contents of the lost or stolen deposit bag, Sanchez/Fortress lost, stole or converted Wal-Mart's money and legal tender.

133. Wal-Mart gave notice of the claim to Lloyds of London through Daniel Sanchez and Leavell Insurance, Inc.

134. Nearly one year has passed and Lloyds of London has never responded to the claim.

135. Nearly one year has passed, and Lloyds of London has never investigated this claim.

136. Nearly one year has passed, and Lloyds of London has refused to pay any proceeds to satisfy this claim, although payment thereof was demanded.

137.   Lloyds of London has breached its contract by failing to investigate and pay said claim.

138.   The damages resulting from this breach are enumerated in the Prayer herein.

## Count XII for Failure to Pay Loss against Century Surety Company and Genesis Indemnity

139.   Plaintiff realleges and incorporates by reference the foregoing allegations.

140.    On July 28, 1998 Daniel Sanchez d/b/a Fortress Security and Investigations obtained a general liability policy numbered CX000 0153 from Genesis Indemnity.

141.   On July 28, 1998 Daniel Sanchez d/b/a Fortress Security and Investigations obtained an excess liability policy numbered CCP170626 from Century Surety Company.

142.   Those two policies did not expire until July 28, 1999.

143.   Wal-Mart Stores, Inc., its subsidiaries and its affiliates are shown as additional insureds on the policies.

144.   On May 3, 1999 while the policies were in full force and effect, and while Wal-Mart was the sole and unconditional owner of the contents of the lost or stolen deposit bag, Sanchez/Fortress lost, stole or converted Wal-Mart's money and legal tender.

145. Wal-Mart gave notice of the claim to Century and Genesis through Daniel Sanchez and Leavell Insurance, Inc.

146. Nearly one year has passed, and Century Surety and Genesis Indemnity have never responded to the notice of claim.

147. Nearly one year has passed, and Century Surety and Genesis Indemnity have never investigated this claim.

148. Nearly one year has passed, and Century Surety Company and Genesis Indemnity have refused to pay any proceeds to satisfy this claim, although payment thereof was demanded.

149. Century Surety Company and Genesis Indemnity have breached their contracts by failing to investigate or pay said claim.

150. The damages resulting from this breach are enumerated in the Prayer herein.

### Count XIII for Breach of Duty of Good Faith and Fair Dealing against Lloyds of London, Century Surety Company and Genesis Indemnity

151. Plaintiff realleges and incorporates by reference the foregoing allegations.

152.  Wal-Mart is an additional insured to the aforementioned policies issued by Lloyds of London, Century Surety Company, and Genesis Indemnity.

153. Lloyds, Century, and Genesis have a duty to deal fairly and in good faith with Wal-Mart in the performance of the various insurance contracts.

154.   Lloyds, Century, and Genesis acted in bad faith when they refused to pay the claim of Wal-Mart without giving any reasons or response.

155.   Lloyds, Century and Genesis failed to act reasonably under the circumstances to conduct a timely and fair investigation of the claim.

156.   Lloyds', Century's and Genesis' failure to timely investigate and pay the claim is a breach of the duty to act honestly and in good faith in the performance of the insurance contracts.

157.   The damages resulting from this breach are enumerated in the Prayer herein.

**Count XIV for Violation of the New Mexico Unfair Practices Act §57-12-2(D) NMSA 1989 against Lloyds of London, Century Surety Company, Genesis Indemnity, and Leavell Insurance, Inc.**

158.   Plaintiff realleges and incorporates by reference the foregoing allegations.

159.   The New Mexico Unfair Practices Act §57-12-2(D) NMSA 1989 prohibits a person selling insurance from engaging in unfair or deceptive trade practices.

160.   This statute was in full force and effect at the time that the aforementioned insurance contracts were entered into, that Wal-Mart's claim was made, and that the claim was denied or ignored.

161. Lloyds of London, Century Surety Company, Genesis Indemnity, and Leavell Insurance, Inc. engaged in unfair and deceptive trade practices.

162. Lloyds of London, Century Surety Company, Genesis Indemnity, and Leavell Insurance, Inc. knowingly and willfully made false and misleading oral and written statements, or other representations which tended to or did deceive or mislead Wal-Mart Stores, Inc.

163. Lloyds of London, Century Surety Company, Genesis Indemnity, and Leavell Insurance, Inc. willfully failed to deliver the quality or quantity of goods or services contracted for.

164. Lloyds of London, Century Surety Company, Genesis Indemnity, and Leavell Insurance, Inc. wilfully represented that the policies and service of those policies were of a particular standard, quality or grade, and they were not.

165. Lloyds of London, Century Surety Company, and Genesis Indemnity, promised to act according to the terms of the various insurance contracts which it entered into with Daniel Sanchez wherein Wal-Mart Stores, Inc. was named as an additional insured and/or loss payee.

166. Lloyds of London, Century Surety Company, and Genesis Insurance willfully did not abide by the terms of their contracts or meet their fiduciary duties with regards to Wal-Mart.

167. Wal-Mart was deceived into believing that Lloyds of London, Century Surety Company, and Genesis Indemnity would treat it as an additional insured and/or loss payee.

168. Leavell Insurance, Inc. acted as insurance agent or broker to Wal-Mart, with all the duties to deal fairly, as a fiduciary, and in good faith, to the extent that Wal-Mart was named as an additional insured or loss payee on the policies.

169. Leavell Insurance, Inc. agreed to transmit notices of claim to Lloyds, Genesis, and Century on behalf of Wal-Mart.

170. Instead, Leavell Insurance, Inc. treated Wal-Mart in a hostile manner, as an adversary and breached all of its duties.

171. The deception of Lloyds, Century, Genesis and Leavell is the proximate cause of Wal-Mart's continued loss of the value of the contents of the lost or stolen deposit bag, reconstruction costs for lost checks, lost interest, attorney's fees and costs.

172.  The willful acts of Lloyds, Century, Genesis and Leavell warrant an award of treble damages against these Defendants, as provided for by the Unfair Practices Act.

## Count XV for Violation of the New Mexico Insurance Code §59A-16-20 NMSA 1984 against Lloyds of London, Century Surety Company, Genesis Indemnity, and Leavell Insurance, Inc.

173.  Plaintiff realleges and incorporates by reference the foregoing allegations.

174.  The New Mexico Insurance Code was in full force and effect at the time the policies between Sanchez and Lloyds, Century, and Genesis were entered into, at the time of the loss, and at the time of the claim.

175.  The New Mexico Insurance Code was also in full force and effect at the time that Leavell Insurance, Inc. procured those polices for Sanchez and Wal-Mart as additional insured.

176.  Lloyds, Century, Genesis and Leavell willfully and knowingly violated the New Mexico Insurance Code by engaging in the following practices:

a.      failing to acknowledge and act reasonably and promptly upon communications with respect to claims from an insured arising under policies;

b.      failing to affirm or deny coverage of claims of an insured within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured;

c.      not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear; and

d.      failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

177.  As a result of these violations of the New Mexico insurance code, Wal-Mart suffered losses due to the denial of the claim, the loss of its property, consequential damages, interest losses, and other compensatory damages.

178.  Wal-Mart also seeks an award of attorney fees, which is allowed under the Insurance Code, against Lloyds, Century, Genesis, and Leavell for their willful violations.

WHEREFORE Wal-Mart Stores, Inc. prays that it be awarded, jointly and severally against all Defendants:

1.    Compensatory damages in the amount of its losses due to the loss or theft of the deposit bag, including the cost of recreating check histories and reconstructing any and all amounts of money due to the loss;

2.    Interest on the compensatory damages at the rate set by Wachovia Bank of Winston Salem, North Carolina from May 3, 1999 to the time that the judgment is satisfied;

3.    Treble damages as allowed by the Unfair Practices Act;

4.    Punitive damages allowed under common law;

5.    Attorney's fees and costs; and

6.    Pre- and post-judgment interest.

Respectfully submitted,

Nelse T. Schreck
A. Brent Bailey
DIXON, SCHOLL & BAILEY, P.A.
Attorneys for Wal-Mart Stores, Inc.
Post Office Box 26746
Albuquerque, New Mexico 87125-6746
Telephone: (505) 244-3890

## Verification of Complaint

I, Tom Heffron, of Wal-Mart Stores, Inc. have read the foregoing Complaint and find the factual allegations contained herein to be truthful and accurate, upon the information and belief available to Plaintiff Wal-Mart Stores, Inc.

_Tom Heffron_

Tom Heffron
Representative for Wal-Mart Stores, Inc.

SUBSCRIBED AND SWORN TO before me this 25th day of _April_ , 2000.

OFFICIAL SEAL
**VALERIE A. MATHEWS**
NOTARY PUBLIC-ARKANSAS
WASHINGTON COUNTY
My Commission Expires 7/28/2005

_Valerie A Mathews_

Notary Public

My Commission Expires: 7/28/2005

## ARMORED CAR SERVICE AGREEMENT

THIS AGREEMENT is between Wal-Mart Stores, Inc., a Delaware corporation having its principal place of business at 702 S.W. 8th Street, Bentonville, AR 72716 ("**Wal-Mart**") and Fortress Security and Investigations, a(n) Armored Car Service, having its principal place of business at 1601 N. Turner; Hobbs, NM 88240, ("**Carrier**"), in connection with the following:

### Background:

Wal-Mart operates retail/wholesale stores at the locations listed on **Exhibit A** ("**Stores**") and desires armored car service from time to time for the purpose of transporting checks, currency, food stamps, drafts, coins, precious metals, notes, bonds, securities and other things of value ("**Property**") from the Stores to the financial institution ("**Bank**") identified on the Manifest with respect to a shipment or from a Bank or a Bank's vault facility to the Stores. Carrier is in the business of providing armored car services for the safe and secure transportation of property between businesses such as Wal-Mart's Stores and their financial institutions. In consideration of the foregoing and the mutual agreements contained below, Wal-Mart and Carrier agree as follows:

1.     **Services To Be Provided.**   Carrier will cause one or more individuals employed by Carrier ("**Collectors**") to: (a) Call at the Stores on the days specified on **Exhibit A** (unless it is a holiday identified on **Exhibit A**, in which event on the next following day) and accept Delivery (as defined in paragraph 5 below) of and receipt for one or more sealed or locked bags or other containers ("**Containers**") of Property; (b) Deliver such Property to the Bank the same day that it is picked up prior to the Bank's deadline for same business day credit (except as may be otherwise specified in **Exhibit A**, and except that the second pickup at a Store on a given day shall be Delivered prior to the Bank's deadline for next business day credit), in the same condition and in the same Container(s), without tampering with or alteration of such Container(s) or the Property contained therein, and shall obtain the Bank's receipt therefor; and (c) Call at the Banks or at vault facilities employed by the Banks (coincidental to delivery of current deposits for next day delivery to the Store or prior to making the Store calls provided in (a) above) and accept Delivery of and receipt for one or more Containers of Property and Deliver such Containers to the Stores and obtain the Stores receipt therefor. Containers of Property may be Delivered by Carrier's Collectors to and receipted for on behalf of the Store and Wal-Mart only by that Store's Manager or Assistant Manager or an Associate (employee) of that Store's Accounting Office.

2.     **Service Fees.**   For the services performed by Carrier under this Agreement, Wal-Mart agrees to pay Carrier the fees described on **Exhibit A**. Fees shall be paid within thirty (30) days after the end of each month for services performed during the prior month. There is no additional fee for Carrier's performing of services with respect to Delivery of Containers of Property from Banks to Stores.

3.     **Shipments.**   All Containers of Property picked up by Carrier from a Store or, in the case of a Change Order, from a Bank or a Bank's vault facility at the same pickup time shall



be deemed a single "**Shipment**" for purposes of this Agreement, regardless of the number of separate Containers or Manifests (as defined in paragraph 4 below) used in connection therewith.

      **4.**    **Containers.**  Wal-Mart agrees to cause all Property to be placed in a Container which is a securely sealed canvas locking bag or securely sealed tamper evident plastic bag or other securely sealed container appropriate for such purpose, which bears a unique number or other identification matching the identification of the Container on the accompanying receipt ("**Manifest**"). Carrier shall refuse to accept Delivery of any Container which does not conform to the foregoing and shall have no liability for such refusal.

      **5.**    **Delivery; Carrier's Liability; Receipts.**  Carrier's liability for a Container and for the contents thereof shall begin upon the transfer of physical custody or control ("**Delivery**") of the Container to a Collector and shall end upon the Delivery of the Container to the Bank (or, to the Store, in the case of a delivery from a Bank to a Store), in accordance with paragraph 1 above and the Bank's (or the Store Manager's, Assistant Manager's or Accounting Office Associate's, in the case of a delivery from a Bank to a Store) signed receipt therefor . Carrier's signed receipt for a Container shall be conclusive evidence of the Delivery of the Container to Carrier, and Wal-Mart's signed receipt (in accordance with the requirements of paragraph 1 above and this paragraph 5) shall be conclusive evidence of the Delivery of the Container to Wal-Mart. By way of example of the foregoing and not in limitation thereof, it is understood that if Carrier places any Property in a night depository or other storage facility made available by a Bank, Carrier shall remain liable for such Property until it is actually and physically received and receipted for by the Bank, and all risk of loss of or damage to the Property while in such depository or other facility shall be borne by Carrier.
When delivery of a shipment cannot be made for any reason, Carrier shall notify Store and return the Shipment to the Store or to Carrier's vault for storage.  Shipments that are refused for any reason will be returned to the Store or to Carrier's vault for storage and notification of such return shall be given to Store.

      **6.**    **Carrier's Exclusions From Liability.**  Carrier shall not be liable for loss of or damage to Property or for damages resulting therefrom while such Property is in the possession of Carrier, nor shall Carrier's insurance be required to cover such damages, to the extent the same are caused by any of the following and are not caused or contributed to by Carrier:

          a.    Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack, (1) by any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval or air forces, or (2) by military, naval or air forces of any such government, power or authority, or (3) by an agent of any such government, power, authority or forces;

          b.    Any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

          c.    Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence

or confiscation by order of any government or public authority other than by reason of acts or omissions of Carrier or a Collector;

      d.    Loss by nuclear reaction or nuclear radiation or radioactive contamination;

      e.    Shortages claimed in the contents of sealed or locked Containers, in the absence of evidence of entry or tampering;

      f.    Any act or default of Wal-Mart that is the direct and proximate cause of a loss or damage.

      7.    **Maximum Liability.**  Unless increased by reason of the provisions of paragraph 8 below, Carrier shall be liable for loss of or damage to Property, up to but not exceeding the maximum amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the **"Maximum Liability Amount"**) per Shipment.

      8.    **Excess Liability Coverage.**  If the Manifest accompanying a Shipment reflects that the Property contained in such Shipment has an aggregate value exceeding the Maximum Liability Amount, the maximum liability of Carrier shall be increased accordingly, and Wal-Mart shall pay to Carrier an excess liability payment equal to $0.10 per $1,000.00 of Property value in excess of the Maximum Liability Amount.

      9.    **Carrier's Liability/Nonliability For Service Delays.**  (a) Carrier shall not be liable for damages (including but not limited to loss of interest) and shall not be subject to the provisions of subparagraph (b) below, resulting from any delay in making a pickup or delivery pursuant to this Agreement to the extent such delay is due to epidemics, pestilence, war, rebellion, insurrection, hostilities, legal process, court action, mechanical failure, accident, fire, act of God or other cause beyond Carrier's control, but Carrier shall remain liable for loss of or damage to the Property itself except as provided in paragraph 6 above.

      (b) It is understood and agreed that Carrier is not a guarantor of any pickup or delivery times set forth as part of this Agreement, and such times are mere approximations or estimates; however, Carrier agrees to use its best efforts to meet the pickup and delivery times. Notwithstanding the previous sentence, (i) in the event of documented failure by Carrier to meet the Bank delivery deadlines (as prescribed in paragraph 1 (b) above) on more than two (2) occasions for any calendar month for any Store, fees otherwise due Carrier for that month at that Store will be reduced by an amount equal to the shipment rate per location times the number of occasions that delivery deadlines were not met; the shipment rate per location is determined by taking the "Rate" from Exhibit A and dividing by the number of pickups that will occur in a 30-day month based on the Schedule in Exhibit A; (ii) in the event of documented failure by Carrier to make a pickup at a Store at all on the day scheduled, Wal-Mart will receive credit for twice the amount of the shipment rate (as described in (i) above) times the number of missed pickups; and (iii) no pickup shall be made at a Store prior to 10:00 a.m. local time, unless otherwise agreed orally or in writing by Carrier and a Store's Manager or a member of Wal-Mart's Home Office Finance Department.

10.   **Time of Essence.**   Notwithstanding the provisions of paragraph 9 above, the parties recognize and acknowledge that time is of the essence to both parties' business; therefore, Wal-Mart agrees that Carrier's Collector shall be required to wait no more than a maximum of fifteen (15) minutes to make a pickup and/or delivery at a Store. If Wal-Mart does not permit a Collector to make a pickup or delivery within that time period, the Collector may leave the Store and such departure shall not be a breach of this contract. If Wal-Mart requests an unscheduled or additional service call be made by Carrier due to any such missed pickup or delivery, Wal-Mart agrees to pay Carrier for the same at a rate to be established by mutual agreement, such charges to be in addition to regular service charges otherwise due Carrier under this Agreement.

11.   **Carrier's Collectors.**   Collectors, at all times while performing services pursuant to this Agreement, shall be armed, uniformed and possess (and upon request by an associate (employee) of Wal-Mart, shall display) appropriate employment identification.   While on Wal-Mart's premises, Collectors shall be subject to Wal-Mart's security requirements and, upon request from time to time, will submit to being photographed by Store personnel and will produce a sample signature for Store personnel to retain.   Carrier shall either: (a) furnish the Manager (or in his/her absence, an Assistant Manager) of each Store with the names of all authorized Collectors of Carrier, together with a sample signature and photograph of each such Collector, certified to be authentic by a management official of Carrier, or (b) furnish each Collector with an identification badge or card bearing a current photograph and the signature of such Collector. Wal-Mart shall be entitled to rely upon such designations and certified signatures of Collectors until the Manager (or in his/her absence, an Assistant Manager) of each Store receives notice from Carrier of revocation of such authority.   Carrier shall be liable for Property Delivered to any person whose unrevoked designation as a Collector and signature are on file with Wal-Mart.   All Collectors shall be duly authorized to carry the firearms carried by them and shall be trained in the appropriate handling and use of such firearms.

12.   **Carrier's Insurance.**

a.     Cargo Insurance (including employee theft) -- Carrier shall at all times maintain the broadest available form (whether called "all-risk" or such other name) of cargo insurance (including employee theft) in amounts sufficient to insure the full value of all Property receipted for or held by Carrier under this Agreement and the property of any and all other shippers whose property is then receipted for or held by Carrier in transit or at its facilities, subject to Carrier's deductible which shall not exceed the amount shown on Exhibit A without first giving Wal-Mart at least ninety (90) days notice.

Wal-Mart, its subsidiaries and affiliates, shall be listed as loss payees on all such cargo insurance.

b.     Liability Insurance -- Carrier shall maintain in full force and effect at all times the following minimum liability insurance coverages:

(i)     Commercial General Liability:  $2,000,000.00 per occurrence;

(ii)    Vehicle Liability (Any Vehicle):  $2,000,000.00 per occurrence ;

(iii)   Worker's Compensation:  Statutory;

(iv)    Employer's Liability:  $1,000,000.00.

Carrier may maintain Excess Liability per occurrence coverages to compensate for any coverages which are less than the minimum coverages.

"Wal-Mart Stores, Inc., Its Subsidiaries and Affiliates," shall be listed as additional insureds with respect to all such liability insurance.

c.      All policies of insurance, exclusive of cargo insurance, shall provide for a waiver of subrogation as to "Wal-Mart Stores, Inc., Its Subsidiaries and Affiliates," to the extent permitted by law.

d.      The insurance coverages required by this paragraph 12 shall be maintained with a company(ies) maintaining an A.M. Best rating of A minus (A-) or better.  Prior to performing any Services pursuant to this Agreement, Carrier will provide Wal-Mart with a current certificate(s) of insurance, and not later than forty-five (45) days after the date of this Agreement Carrier will provide Wal-Mart with a copy of the endorsement page(s) of the policy(ies), with the certificate holder to be listed as follows:  Wal-Mart Stores, Inc., its Subsidiaries & Affiliates; Finance Department; 702 S. W. 8th Street; Bentonville, AR 72716-8001, which certificate(s) and endorsement page(s) shall contain information sufficient to verify Carrier's compliance with this paragraph 12.  Upon request, Carrier shall also furnish Wal-Mart with a copy of all or any portion of any or all policies of insurance.

## 13.    Indemnification.

(a)     Carrier agrees to defend, indemnify and hold harmless Wal-Mart, its shareholders, partners, directors, officers, agents and employees, from and against any and all claims, demands, actions, causes of action, losses, expenses and liabilities to the extent arising out of or by reason of the acts, omissions, performance or nonperformance of this Agreement of or by Carrier or its employees.

(b)     Wal-Mart agrees to defend, indemnify and hold harmless Carrier, its shareholders, partners, directors, officers, agents and employees, from and against any and all claims, demands, actions, causes of action, losses, expenses and liabilities to the extent arising out of or by reason of the acts, omissions, performance or nonperformance of this Agreement of or by Wal-Mart or its employees.

## 14.    Notice of Loss; Payment of Claims.    In the event of loss of or damage to Property for which Carrier is liable under this Agreement (a "**Loss**"), Wal-Mart shall give Carrier notice of such Loss within thirty (30) days following discovery by the Home Office Finance Department of Wal-Mart.  Wal-Mart's notice of Loss shall include the Container identification,

the date of Delivery of the Container to Carrier and the value of the Property lost (broken down into the value of cash, the value of checks and the value of any other Property, to the extent such information is available to Wal-Mart's Home Office Finance Department at the time of the giving of such notice). A claim for which notice of Loss was not given in accordance with the foregoing shall not be barred unless such failure to give such notice materially prejudiced Carrier's ability to reduce the amount of such Loss and then only to the extent of such prejudice. Any suit by Wal-Mart to recover for a Loss shall be brought within two (2) years after the date such notice was given. Carrier shall pay Wal-Mart for Losses (including but not limited to the amount of any checks) within thirty (30) days after notice of such Loss, and any amounts not paid within such time, for which Carrier shall be obligated, shall bear interest at the "Prime Rate" as established from time to time by Wachovia Bank & Trust Co., Winston-Salem, NC, thereafter until paid.

**15.** **Cooperation by Wal-Mart; Checks.** Upon payment of a Loss by Carrier, Wal-Mart will assign to Carrier all of Wal-Mart's rights to the Property comprising the Loss and will cooperate reasonably with Carrier in reconstructing any checks or other non-cash items constituting a part of such Loss, and Carrier shall reimburse Wal-Mart for any costs incurred in doing so plus any costs incurred to stop payment of any such checks, in which case Carrier's reimbursement obligation for check reconstruction shall not be subject to the maximum liability limits set forth in paragraphs 7 and 8 above.

**16.** **Term; Termination.**

a.     This Agreement shall be for a term of two (2) years, commencing on the 16th day of June , 1997. At the expiration of the time set forth in the preceding sentence, this agreement shall be automatically extended from month to month on the same terms and conditions, until terminated by either party giving not less than thirty (30) days' notice (which notice shall specify the date the termination is to be effective), or until a new agreement is executed by the parties.

b.     Either party may terminate this Agreement at any time as to any or all Stores upon not less than thirty (30) days' notice to the other party, except in the event of failure by Carrier to comply with paragraph 12 above, in which event no advance notice of termination shall be required. Termination shall not affect any rights, duties or liabilities of the parties arising prior to termination.

**17.** **Annual Reports.** Within ninety (90) days after the end of each of Carrier's fiscal years, Carrier will provide Wal-Mart with an audited financial statement of Carrier's operations for that year and of Carrier's condition as of the end of that year.

**18.** **Independent Contractor Status.** The relationship created hereunder is that of independent contractors and no other. Wal-Mart shall have no control or right to exercise any control whatsoever over the employees of Carrier in their performance of this Agreement. Wal-Mart shall not have the right nor shall it attempt to exercise the right to establish the rate of pay, benefits, hours of work or other terms or conditions of employment of the employees of Carrier. Wal-Mart shall not select, supervise, direct or in any other way control or seek to control the

employees of Carrier. Carrier agrees to and warrants that it will comply with all applicable federal, state, local and other laws and regulations relating to wages, the payment of wages and the withholding of sums from wages for taxes and otherwise, and that it will promptly remit to the appropriate recipients all monies withheld from the pay of employees and all monies due from Carrier as an employer related in any way to the employment of its employees. Carrier further agrees to and warrants that it will comply with all applicable federal, state, local and other laws and regulations relating in any way to employment, including but not limited to those relating to discrimination, veterans' rights, the hiring of the disabled and workers' compensation.

19. **Assignment; Benefit; Binding Effect.** This Agreement may not be assigned by either party without the prior written consent of the other party; provided, however, a party may assign this Agreement to an entity which owns or controls, is owned or controlled by, or is under common owner or control with that party, but no such assignment shall relieve a party of its duties and liabilities under this Agreement. Any change in the direct or indirect ownership or control of more than fifty percent (50%) of the outstanding capital stock of a party shall be deemed an assignment for purposes of this Agreement. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

20. **Amendments; Modifications.** This Agreement may be amended or modified only by a writing signed by all of the parties to this Agreement.

21. **Severability.** The invalidity or unenforceability of any one or more provisions of this Agreement shall not affect the validity or enforceability of the remaining portions of this Agreement.

22. **Waiver.** No waiver of any provision of this Agreement shall be effective unless in writing and signed by the party waiving. No waiver of a provision on one occasion shall be deemed a waiver of that provision on a separate occasion.

23. **Notices.** Any notice given in connection with this Agreement shall be in writing and addressed as indicated at the end of this Agreement or to such other address of which notice hereafter may be given and shall be deemed given when delivered in person or by courier or on the third business day after mailed, postage prepaid, by certified mail, return receipt requested. Notwithstanding the previous sentence, any notice given with respect to adding or deleting Stores or revising the schedule for Stores may be given by facsimile to the numbers indicated at the end of this Agreement or to such other number(s) of which notice hereafter may be given in accordance with the previous sentence, if receipt of such facsimile notice is acknowledged by a writing signed by the recipient party.

24. **Entire Agreement.** This Agreement, together with any exhibits, schedules or other writing attached hereto or incorporated by reference herein, constitute the entire agreement between the parties with respect to the subject matter of this Agreement, and all prior and contemporaneous negotiations, agreements and understandings are hereby superseded, merged and integrated into this Agreement.

25.   **Counterparts.**   This Agreement may be executed in one or more counterparts, all of which shall be deemed one and the same agreement and shall become effective when each of the parties has signed one or more counterparts.

26.   **Governing Law; Jurisdiction; Venue.**   This Agreement shall be governed by and construed in accordance with the laws of the State of Arkansas, without regard to the internal law of Arkansas regarding conflicts of laws.   The parties mutually consent and submit to the jurisdiction of the federal and state courts for Benton County, Arkansas, and agree that any action, suit or proceeding concerning this Agreement or any of the related agreements which may be entered into between Wal-Mart and Carrier shall be brought only in the federal or state courts for Benton County, Arkansas except that any action, suit or proceeding relating to the loss of all or part of one or more Shipments from a Store shall be brought only in the federal or state courts for the county in which such Store is located.   The parties mutually acknowledge and agree that they will not raise, in connection with any such suit, action or proceeding brought in any federal or state court for Benton County, Arkansas, any defense or objection based upon lack of personal jurisdiction, improper venue or inconvenience of forum.   **The parties acknowledge that they have read and understand this clause and agree willingly to its terms.**

27.   **Carrier Entities.**   From time to time Services may use subsidiaries or other entities which it owns or controls ("Carrier Entities") in connection with this Agreement, some of which Carrier Entities may not have executed this Agreement.   By doing so, Services agrees that is shall be fully liable and responsible for the acts and omissions of each and all of the Carrier Entities, with the same force and effect as though such acts or omissions were of Carrier itself.   In addition, each such Carrier Entity will be deemed to have agreed to each and all of the provisions of this Agreement with the same force and effect as though such Carrier Entity had executed this Agreement.   **Exhibit A** reflects Stores which are expected to be served by particular Carrier Entities, but the foregoing provisions of this paragraph will apply whether or not **Exhibit A** is accurate in that regard.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their undersigned officers who are thereunto duly authorized, to be effective as of the 3rd day of June, 1997.

WAL-MART STORES, INC.    FORTRESS SECURITY AND
             INVESTIGATIONS


By _Terri Bertschy_     By _Daniel P. Sanchez_
Name: _Terri Bertschy_    Name: _Daniel Sanchez_
Title: _Vice President - Treasurer_ Title: _President_

## ADDRESSES FOR NOTICES

To Wal-Mart:

  Notices other than pursuant to paragraph 11: Notices pursuant to paragraph 11:

  Wal-Mart Stores, Inc.      Wal-Mart Stores, Inc.
  Attn: Finance Department   Attn: Store Mgr./Ass't. Mgr.
  702 S.W. 8th Street      [address of Store per Exhibit A]
  Bentonville, AR 72716-8001

  Facsimile:  501-273-1969

To Carrier:

  Fortress Security and Investigations
  Attn: Daniel Sanchez
  1601 N Turner, Suite 110
  Hobbs, NM  88240

  Facsimile:  505-393-5516

The following Stores will all receive same day banking on their first pickup each day unless the Store number below is denoted with an asterisk (*).  Same day banking is defined as Delivery to the designated Bank the same business day as pickup, no later than the Bank's cutoff time for same business day credit.  If a location has a second pickup on a day, such pickup will be Delivered to the designated Bank no later than the following business day, prior to the Bank's cutoff time for same day credit.  Each location's first pickup time shall be no earlier than 10:00 a.m. (local time) unless otherwise agreed orally or in writing by Carrier and a Store's Manager or a member of Wal-Mart's Home Office Finance Department. 1 x M-SU indicates one pickup each day Monday through Sunday.  1 x M-SA indicates one pickup each day Monday through Saturday.

Maximum Deductible allowed on Cargo Insurance (see paragraph 12a):   $500.00

The following are holidays for purposes of this Agreement:

| | |
|---|---|
| Wal-Mart Stores ("WMT") | Easter Sunday, Thanksgiving Day, Christmas Day |
| Wal-Mart Supercenters ("WMSC") | Christmas Day |
| Sam's Club ("SAM'S) | New Year's Day, Easter Sunday, Thanksgiving Day, Christmas Day |

| Type | Store # | Address | City | State | Mo. Charge | Schedule |
|------|---------|---------|------|-------|------------|----------|
| WMT | 549 | 1822 North Turner St | Hobbs | NM | $400.00 | 2 x M-SA/1 x SU |
| WMT | 868 | 2101 S Canal | Carlsbad | NM | $400.00 | 1 x M-SA |

OCT-22-98 WED 17:18    WALMART FINANCE        FAX NO. 5012151505

## AMENDMENT TO ARMORED CAR SERVICE AGREEMENT

Our agreement dated 6-3-97 is hereby amended as follows:

Service:          ( )       Change in Price
                  ( )       Change in Service - increasing/decreasing pickups
                  (X)       Addition of new Store(s) to be serviced
                  ( )       Cancellation of existing Store(s) currently being serviced

Effective Date:           11-23-98

| Type | Store # | Address | City | State | Mo. Charge | Schedule | SDB*/NDB** |
|------|---------|---------|------|-------|------------|----------|------------|
| WMT | 829 | 3251 Cerrillos | Santa Fe | NM | 400.00 | 1 x M-SU | SDB |
| SAM'S | 6408 | 4201 Rodeo Rd | Santa Fe | NM | 400.00 | 1 x M-SU | SDB |
| WMT | 873 | 926 Paseo Pueblo | Taos | NM | 400.00 | 1 x M-SU | SDB |
| WMSC | 1380 | 2609 7th St | Las Vegas | NM | 400.00 | 1 x M-SU | SDB |
| WMSC | 842 | 4200 Dillion Dr | Pueblo | CO | 400.00 | 1 x M-SU | SDB |
| WMT | 1001 | 4080 W Northern Ave | Pueblo | CO | 400.00 | 1 x M-SU | SDB |
| SAM'S | 6549 | 412 Eagleridge Blvd | Pueblo | CO | 400.00 | 1x M-SU | SDB |
| SAM'S | 8272 | 715 S Academy Blvd | Colorado Springs | CO | 800.00 | 2 x M-SA/1x SU | SDB |
| WMSC | 1896 | 8250 Razorback | Colorado Springs | CO | 400.00 | 1 x M-SU | SDB |
| WMSC | 1434 | 707 S 8th St | Colorado Springs | CO | 800.00 | 2 x M-SA/1x SU | SDB |
| WMSC | 1200 | 3201 E Platte Ave | Colorado Springs | CO | 400.00 | 1 x M-SU | SDB |

Except as herein or previously amended, our Agreement remains in force and effect in accordance with its terms and provisions.

Agreed:                                    Agreed:

WAL-MART STORES, INC.                      FORTRESS SECURITY AND INVESTIGATIONS

By: _____             By: _____

Name:  Michael A. Cook                     Name:  Daniel Sanchez
Title:   Assistant Treasurer - Operations  Title:   President

* "Same Day Banking/SDB" is defined as Delivery to the designated Bank the same business day as pickup, no later than the Bank's cutoff time for same business day credit, except that the second pickup at a Store on a given day shall be Delivered prior to the Bank's deadline for next business day credit.

** "Next Day Banking/NDB" is defined as Delivery to the designated Bank the business day following a pickup, no later than the Bank's cutoff time for same business day credit.

c:\wlmword\contract\asxond